No. 14-3678
_____

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT
_____

OHIO COUNCIL 8 AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, *et al*.,

Appellants,

v.

SECRETARY OF STATE, *et al*.,

Appellees.

_____

On Appeal From The United States District Court
For The Southern District Of Ohio (Western Division)
_____

**REPLY BRIEF FOR APPELLANTS**
_____

Alphonse A. Gerhardstein
Jennifer L. Branch
Gerhardstein & Branch
432 Walnut Street
Suite 400
Cincinnati, Ohio 45202
(513) 621-9100
agerhardstein@gbfirm.com

Stephen L. Braga
(Counsel of Record)
David Martin (Third Year Law Student)
Cory Ward (Third Year Law Student)
Jack Zugay (Third Year Law Student)
UNIVERSITY OF VIRGINIA
SCHOOL OF LAW
Appellate Litigation Clinic
580 Massie Road, SL-251
Charlottesville, VA 22903-1789
(434) 924-3825
stevebraga@virginia.edu

*Counsel for Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

I.  Properly Understanding the *Anderson-Burdick* Framework ...............................2

    1.  The *Anderson-Burdick* Balancing Test .....................................................2

    2.  Why it is Appropriate to Analyze State Interests First ............................4

II.  The State Mischaracterizes the Burdens Placed on Appellants...........................6

    1.  Clarifying *Timmons*...................................................................................6

    2.  The Burdens on Appellants are More Than Minimal. .............................8

III. CONCLUSION...................................................................................................13

CERTIFICATE OF COMPLIANCE.......................................................................15

CERTIFICATE OF SERVICE ................................................................................16

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ................................................. passim

*Bullock v. Carter*, 405 U.S. 134 (1972) ....................................................3

*Burdick v. Takushi*, 504 U.S. 428 (1992)........................................ passim

*Carey v. Wolnitzek*, 614 F.3d 189 (6th Cir. 2010) ....................................13

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008)................................2

*Eu v. San Francisco County Democratic Cent. Committee*, 489 U.S. 214 (1989)....3

*Northeast Ohio Coalition for Homeless v. Husted*, 696 F.3d 580 (6th Cir. 2012)....2

*Pearson v. Callahan*, 555 U.S. 223, 241-42 (2009) ....................................5

*Strickland v. Washington*, 466 U.S. 668 (1984) ........................................5

*Tashjian v. Republican Party of Conn.*, 479 U.S. 208 (1986)..............................2, 3

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997).............. passim

## Statutes

O.R.C. § 3505.04 .......................................................................... passim

## Other Authorities

2010 ELECTION RESULTS,
    http://www.sos.state.oh.us/sos/elections/Research/electResultsMain/2010results/
    20101102appeals.aspx .........................................................................11

2012 ELECTION RESULTS,

   http://www.sos.state.oh.us/elections/Research/electResultsMain/2012Results.asp

   x ...............................................................................................................11

Becky Kruse, *Luck and Politics: Judicial Selection Methods and Their Effect on*

   *Women on the Bench*, 16 WIS. WOMEN'S L.J. 67 (2001) .....................................10

Daniel Hays Lowenstein, Richard L. Hasen & Daniel P. Tokaji, ELECTION LAW:

   CASES AND MATERIALS (5th ed. 2012) ................................................................2

David Schultz, Minnesota Republican Party v. White *and the Future of State*

   *Judicial Selection*, 69 ALB. L. REV. 985 (2006) ..................................................10

Peter D. Webster, *Selection and Retention of Judges: Is There One "Best"*

   *Method?*, 23 FLA. ST. U. L. REV. 1 (1995) ..........................................................10

No. 14-3678

_____

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

OHIO COUNCIL 8 AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, *et al*.,

Appellants,

v.

SECRETARY OF STATE, *et al*.,

Appellees.

_____

On Appeal From The United States District Court
For The Southern District Of Ohio (Western Division)

_____

**REPLY BRIEF FOR APPELLANTS**

_____

Every other November, Ohioans enter the election booth to vote for their preferred judicial candidates, only to find their efforts frustrated by a perplexing election law unique to Ohio. Judicial candidates, including incumbents that currently sit on the state bench, campaign by emphasizing their political party on television and in person. They openly affiliate and claim the benefits that attend membership in a major political party, and many voters rely on parties as a proxy for a candidate's platform. Then voters walk into the booth, and the party

1

affiliation evaporates.  Without that party affiliation information, more than thirty percent of those voters then decline to cast ballots for state judicial candidates. This is the real and substantial associative burden Ohio's law places on voters, candidates, and the political parties alike.  Under the Supreme Court's current First Amendment jurisprudence, Ohio's election law fails to pass constitutional muster.

## I.  Properly Understanding the *Anderson-Burdick* Framework

### 1.  The *Anderson-Burdick* Balancing Test

The State attempts to distract the Court from a proper understanding and application of the *Anderson-Burdick* analysis by repeatedly insisting that there is no severe burden on Appellants' First Amendment rights.  However, the *Anderson-Burdick* inquiry requires more than this.  Even if there is a less-than-severe burden, the State must show that its measure sufficiently advances a legitimate state interest, justifiable in light of the burden it places on a plaintiff's constitutional right.  *See, e.g.*, *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997); *Northeast Ohio Coalition for Homeless v. Husted*, 696 F.3d 580, 592 (6th Cir. 2012) ("For the majority of cases falling between these extremes [of no burden and severe burden], we apply the "flexible" *Anderson*/*Burdick* balancing test.").

The constitutionality of any ballot restriction is analyzed under the *Anderson-Burdick* framework.  *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 204 (2008) (Scalia, J., concurring) ("To evaluate a law respecting the right to

vote—whether it governs voter qualifications, candidate selection, or the voting process—we use the approach set out in *Burdick*.")[1] According to the Supreme Court, "[a] court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.' " *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 213–14 (1986)).

If the State's regulation imposes a burden that is less than severe,[2] the State nonetheless must show that the regulation serves a correspondingly weighty state interest. A state's right to regulate its elections does not shield its efforts from constitutional scrutiny: "A State's broad power to regulate the time, place, and

---

[1] Daniel Hays Lowenstein, Richard L. Hasen & Daniel P. Tokaji, ELECTION LAW: CASES AND MATERIALS 507 (5th ed. 2012) ("The standard articulated in *Burdick* and *Anderson* has become increasingly important in recent years, because it has been used in constitutional challenges to other kinds of election laws, including challenges to blanket primaries and voter identification laws." (citations omitted)).

[2] If the State's regulation imposes a severe burden, the regulation must "advance[] a compelling state interest, and [be] narrowly tailored to serve that interest." *Burdick*, 504 U.S. at 434 (internal citations omitted). In other words, a severe burden implicates strict scrutiny. However, the constitutional inquiry does not end if the burden is not severe. Instead, the inquiry simply shifts to a different scrutiny level on the balancing spectrum, one that more closely parallels the extent of that differing burden.

manner of elections 'does not extinguish the State's responsibility to observe the limits established by the First Amendment rights of the State's citizens.' " *Eu v. San Francisco County Democratic Cent. Committee*, 489 U.S. 214, 222 (1989) (quoting *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 217 (1986)).

Ohio cannot simply assert a legitimate state interest; O.R.C. § 3505.04 must actually further this interest to a degree sufficient to counterbalance Appellants' burdened rights. The State has failed to articulate how it does so. "[E]ven under conventional standards of review, a State cannot achieve its objectives by totally arbitrary means; the criterion for differing treatment must bear some relevance to the object of the legislation." *Bullock v. Carter*, 405 U.S. 134, 145-46 (1972) (holding unconstitutional Texas's fee requirement imposed on candidates because, even though the measure did in fact further the State's interest to a minimal degree, the measure was "extraordinarily ill-fitted to that goal; other means to protect those valid interests [were] available"). Even under a less exacting review than strict scrutiny, where the State's legitimate interest is furthered to some degree, the State must still show the measure *sufficiently* advances its interest in light of the burden.

### 2.  Why it is Appropriate to Analyze State Interests First

Appellants' Brief structured the *Anderson-Burdick* analysis by first analyzing the lack of any state interest furthered by O.R.C. § 3505.04, then analyzing the burdens imposed by the law, and finally comparing the interests to

the burdens.  Ohio suggests that ordering is important—that a court must analyze the burdens *before* proceeding to the state interests.  *See* Appellees' Brief, p. 8. There is no such requirement.  Nothing turns on the ordering of the *Anderson-Burdick* inquiry.

*Anderson-Burdick* requires this Court to compare the state interest furthered with the constitutional burden the law imposes.  There is no sequential element to the test, and the results of this balancing test do not change depending on whether one weighs burdens before interests, or vice-versa.  The value of each must be assessed independently, and then their relative weights compared.  It follows that if a law effectively furthers *no* state interest, the burdening of *any* constitutional right renders the measure unconstitutional.  That is the case at bar.

It is true that courts have often analyzed the severity of the alleged burdens before addressing the interests furthered by the measure, but only because the inquiry must be structured *somehow* in order to be manageable.  The Supreme Court has repeatedly recognized that such multi-part tests can be reordered if doing so presents a more efficient way of addressing the case at hand.[3]  The bottom line

---

[3] *See, e.g.*, *Strickland v. Washington*, 466 U.S. 668, 696–98 (1984) ("In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."); *Pearson v. Callahan*, 555 U.S. 223, 241–42 (2009) ("This flexibility properly reflects our respect for the lower federal courts that bear the

5

remains the same: If the weight of the burdened rights is greater than the weight of the State's interest, the State's measure is unconstitutional.

## II. The State Mischaracterizes the Burdens Placed on Appellants

### 1. Clarifying *Timmons*

The State seeks to rely on the Supreme Court's statement in *Timmons* that "[b]allots serve primarily to elect candidates, not as forums for political expression." 520 U.S. 363. Ohio apparently takes this statement to indicate a lack of *any* burden on the Appellants by a ballot restriction. Appellees' Brief, p. 10. This stems from its misunderstanding of the *Anderson-Burdick* framework.

When a court deems the constitutional burdens imposed by a ballot restriction less than severe, the court must then balance those burdens against the legitimate state interests furthered by the law. *Timmons*, 520 U.S. at 358. The Court made its statement that "[b]allots serve primarily to elect candidates" in determining that the burden imposed by Minnesota's fusion ban was less than severe.[4] *Id.* at 352. What Ohio's brief omits is that the *Timmons* Court then proceeded—as the *Anderson-Burdick* framework mandates—to "weigh the

---

brunt of adjudicating these cases. Because the two-step *Saucier* procedure is often, but not always, advantageous, the judges of the district courts and the courts of appeals are in the best position to determine the order of decisionmaking that will best facilitate the fair and efficient disposition of each case.").

[4] To reiterate, we do not challenge here the District Court's ruling that O.R.C. § 3505.04 imposes less than severe burdens on Appellants' First Amendment rights. See Order, R. 88, Page ID # 1089, 1102, 1104, 1110, 1113.

" 'character and magnitude' " of the burden the State's rule imposes on [constitutional] rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Id.* at 358 (quoting *Burdick*, 504 U.S. at 433 (1992) (quoting *Anderson*, 460 U.S. at 789 (1983))).   In other words, it determined that Minnesota's ban on fusion candidates imposed *some* burdens, and weighed those against the State's legitimate interests.   *Timmons*, 520 U.S. at 364.   That balancing test is precisely what Appellants ask this Court to undertake.

The result of the balancing test in *Timmons*—that Minnesota's interests justified the constitutional burden—was expressly due to factors not present in the instant case.  The burdens imposed by Ohio's prohibition on *all* political parties is self-evidently larger than Minnesota's fusion ban in *Timmons*, which burdened the associational rights only of minor political parties.  Moreover, the state interests present in *Timmons*—"avoiding voter confusion, promoting candidate competition (by reserving limited ballot space for opposing candidates), preventing electoral distortions and ballot manipulations, and discouraging party splintering"—are inapplicable to Ohio's ballot restriction.   *Id.* at 364.  Ohio has instead asserted a single interest in removing partisanship from judicial elections.  For the reasons articulated in Appellant's Brief, pp. 15–23, and notwithstanding the State's conclusory assertion to the contrary, Appellees' Brief, pp. 21–22, O.R.C.

§ 3505.04 does nothing to actually further this purported interest. The constitutional burdens—more insidious here than in *Timmons*—necessarily outweigh a purported state interest that is not credibly advanced by the law. O.R.C. § 3505.04 accordingly must be invalidated.

### 2. The Burdens on Appellants are More Than Minimal.

The State argues that O.R.C. § 3505.04 does not burden the First Amendment rights of any of the parties in this case. Appellees' Brief, p. 13, 17, 20. This argument is inconsistent with the District Court's findings. While the State is certainly free to argue that the District Court erred in its finding that there was some burden on Appellant's constitutional rights, its characterization of the holding begs for correction.

It is true that the District Court found that the Ohio statute does not impose a *severe* burden on the rights of the candidates, voters, or the Democratic Party. *See* Order, R. 88, Page ID # 1102 (finding that there is no *severe* burden on judicial candidates' right to free expression), 1107 (holding that, while a "close call," there is no *severe* burden on voters' associational rights), 1113 (finding that there is no *severe* burden on the Democratic Party's associational rights). This does not end the *Anderson-Burdick* inquiry, which then evaluates whether the burdens *outweigh* the state interests advanced by the law. In at least one instance—regarding a candidate's right to associate—the District Court expressly found a restriction on

8

associational rights, albeit a "minimal" one. *Id.* at #1104. The District Court did not suggest that there were no burdens whatsoever. Rather, the implication of the District Court's language is that O.R.C. § 3505.04 places some appreciable burden on Appellants' protected First Amendment rights. It is impossible to read the record otherwise.

As the case law makes clear, the inquiry does not end when a court deems the burdens less than severe. The court must then balance those burdens against the legitimate state interests furthered by the law. *Timmons*, 520 U.S. at 358. Despite acknowledging that the Ohio statute does not serve the State's interest "particularly well," the District Court determined that the State's interest outweighs the less than severe burdens on Appellants' associative and expressive rights. Order, R. 88, Page ID #1118. We maintain that the District Court erred when it conducted this balancing test because it ignored the fact that the State's purported interest is not advanced at all.

Because Ohio's statute does not advance its purported interest, it is unconstitutional if it imposes *any* burden on Appellants' rights of association or expression. The State seeks to minimize the significance of undervoting on the general election ballot when it comes to judicial races. To the contrary, undervoting is a significant and demonstrable harm caused by the statute's restriction on partisan affiliation. The drop off in voter participation due to non-

9

partisan elections is tangible proof that the burdens imposed by the statute are real and more than minimal.

The 2008 general election results for Hamilton County show the precipitous voter drop off that can occur in judicial races. Plaintiffs' Exhibit 22 (TRO Hearing, 8/13/10). There were four judicial races on the ballot. Two races were for a seat on the Ohio Supreme Court and saw a drop off in voting of 26.45% (113,525 voters) and 30.99% (133,008 voters), respectively.[5]  *Id.*  There were also two races for a seat on the Court of Common Pleas. These races saw a drop off of 23.60% (101,296 voters) and 32.17% (138,100) respectively.  *Id.*  According to unrebutted expert testimony in the trial court, this "is an effect that's caused by nonpartisanship." Transcript, R. 46, Page ID # 725 (Margolis). In other words, the lack of party affiliation for judicial candidates on the Ohio ballot apparently leads voters who rely on such information to simply decline to vote without it. A myriad of other studies support this expert conclusion.[6]

---

[5] The "undervote" for a particular race describes the number of people that cast a ballot in the election, but declined to vote on that race. Voter drop off percentage is calculated by dividing the number of undervotes in a specific race with the total ballots cast. *See* Transcript, R. 46, Page ID # 651 (Good). For example, a total of 429,267 ballots were cast during the 2008 general election in Hamilton County. In one of the races for State Supreme Court, there were 133,008 undervotes, meaning that many of the 429,267 voters declined to vote in that race. Thus, 30.99% of ballots cast did not include a vote for this specific race (133,008 / 429,267 = 0.3099). *See* Plaintiffs' Exhibit 22 (TRO Hearing, 8/13/10).

[6] *See, e.g.*, David Schultz, Minnesota Republican Party v. White *and the Future of State Judicial Selection*, 69 ALB. L. REV. 985, 1007 (2006) (arguing that partisan

The impact of voter drop off in judicial races is striking.  In 2010, Appellant Martha Good ran for a seat on the Ohio First District Court of Appeals.  Good Declaration, PX-11, Page ID # 85.  Good ultimately lost the race by the relatively small margin of 43,126 votes.  *See* 2010 ELECTION RESULTS, http://www.sos.state.oh.us/sos/elections/Research/electResultsMain/2010results/20 101102appeals.aspx (last visited Nov. 25, 2014).  Good also ran in 2012 for a seat on the Ohio First District Court of Appeals.  *See* 2012 ELECTION RESULTS, http://www.sos.state.oh.us/elections/Research/electResultsMain/2012Results.aspx (last visited Nov. 24, 2014).  Good lost the race to the incumbent by a total of 26,027 votes.  *Id.*  Both of these margins are quite small when compared to the over 100,000 voters who routinely choose not to participate in these races, apparently because of the lack of partisan identifiers.  By implementing an electoral regime that funnels candidates through a state-sponsored partisan primary, but then strips candidates of their party label at the time of the general election, the State interferes with the associational rights of Appellants.  The law thus causes a demonstrable harm that likely changes the outcome of some judicial

---

elections "might actually encourage more interest in [judicial] races reversing the ballot drop off phenomena."); Becky Kruse, *Luck and Politics: Judicial Selection Methods and Their Effect on Women on the Bench*, 16 WIS. WOMEN'S L.J. 67, 79 (2001) ("[Voter] education appears to be the most determinative factor in voter drop off."); Peter D. Webster, *Selection and Retention of Judges: Is There One "Best" Method?*, 23 FLA. ST. U. L. REV. 1, 18 (1995) ("[B]ecause voters are unable to intelligently cast their vote for judicial elections, many simply do not vote in those races.").

races.

Instead of confronting this issue, the State spends the vast majority of its brief detailing how there is no Sixth Circuit or Supreme Court precedent directly on point—that no factually analogous case binds this Court. This is true. But the reason that there is no factually analogous case is because Ohio is the only state in the Union that considers this electoral arrangement appropriate. Ohio has failed to explain how O.R.C. § 3505.04 furthers its purported state interest or how it justifies the interference with Appellants' First Amendment rights.

The State tellingly spends only two conclusory paragraphs attempting to refute the argument that none of Ohio's purported interests are advanced by O.R.C. § 3505.04. Appellees' Brief, pp. 21–22. Far from asserting that "the State must either cleanse the entire judicial election process of partisanship or embrace it wholesale," Appellees' Brief, p. 22, we argue only that the State's interest in limiting partisanship cannot be deemed furthered by a ballot measure that only serves to confuse voters. There are countless hypothetical state interests that are not furthered by O.R.C. § 3505.04, and limiting partisanship is one of them. For that reason, when weighed against the undeniable burdens the State imposes on Appellants' constitutional rights, the law fails the *Anderson-Burdick* standard.

Contrary to the State's assertion, what we request from this Court is not a mere policy determination. Appellants do not seek to substitute their judgment

regarding what is sound policy for that of the State's. Rather, we argue that this particular electoral arrangement does not pass constitutional muster. The Constitution is ambivalent as to whether an unconstitutional law is 160 years old or 160 seconds old. The State is of course free to structure its elections however it chooses, so long as it does so constitutionally. It has not done so here.

## III.   **CONCLUSION**

Everyone recognizes that the most important attribute of a participatory democracy is participation itself. Voter turnout is always key. Yet as demonstrated above, O.R.C. § 3505.04 dramatically reduces the number of Ohio voters participating in judicial elections. This adversely impacts not only those voters, but also the judicial candidates who might have received those votes as well as their affiliated parties.

Ohio's asserted justification for causing this adverse impact is too thin a reed to support it. Justice Brandeis once famously said that "sunlight is the best disinfectant." For 163 years, Ohio has cloaked the party affiliations of its judicial candidates in darkness in the voting booth. It is high time to let the light of party affiliation shine on the ballots for judicial candidates in the voting booths of Ohio.

Respectfully submitted,

|  | /s/ Stephen L. Braga |
| --- | --- |
| Alphonse A. Gerhardstein | Stephen L. Braga |
| Jennifer L. Branch | (Counsel of Record) |
| Gerhardstein & Branch | David Martin (Third Year Law Student) |
| 432 Walnut Street | Cory Ward (Third Year Law Student) |
| Suite 400 | Jack Zugay (Third Year Law Student) |
| Cincinnati, Ohio 45202 | UNIVERSITY OF VIRGINIA |
| (513) 621-9100 | SCHOOL OF LAW |
| agerhardstein@gbfirm.com | Appellate Litigation Clinic |
|  | 580 Massie Road, SL-251 |
|  | Charlottesville, VA 22903-1789 |
|  | (434) 924-3825 |
|  | stevebraga@virginia.edu |

*Counsel for Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the type-volume limitation set forth in Sixth Circuit Local Rule 32(a)(7)(B)(ii).    According to the word-processing system used for the brief, it contains 3,411 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in the Times New Roman 14 point font size.

/s/ Stephen L. Braga
Counsel for Appellants

Date: December 4, 2014

## **CERTIFICATE OF SERVICE**

I hereby certify that, on December 4, 2014, the foregoing brief was served electronically on all attorneys of record through the Court's electronic filing and service system.

/s/ Stephen L. Braga
Counsel for Appellants

Date: December 4, 2014